**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

**v.**                                                    **Criminal Action No.  05-0372 (JDB)**

**EDDIE DUBOSE,**

**Defendant.**

**MEMORANDUM OPINION**

Presently before the Court is defendant's motion to suppress physical evidence recovered from the defendant and from a warrantless search of a green Lexus that was parked on private property -- outside of both defendant's physical reach and the arresting officers' line of view -- approximately one block away from where he was arrested.  For the reasons that follow, the Court will grant defendant's motion in part and deny it in part.

**BACKGROUND**

I.  *Factual Background*

On September 7, 2005, the Metropolitan Police Department's ("MPD") Fourth District Focus Mission Team ("4D FMT") received an e-mail complaint, authored by the neighborhood's ANC Commissioner, that implicated a person named Eddie Dubose in illegal activity allegedly occurring at the 600 block of Emerson Street, NW.  Tr. at 4, 13.[1]  Specifically, the e-mail claimed that Dubose sold narcotics from a blue van in that area, and provided a license plate number for

---

[1]All citations to "Tr." refer to the official transcript from the suppression hearing held on February 24, 2006.

the blue van.  Id. at 4, 5.  The e-mail also represented that residents in the area were fearful of, and

threatened by, this person.  Id. at 4, 5, 14.  In response, six members of the 4D FMT were

dispatched to the location.  Id. at 4, 5, 15-16.  Although the officers traveled in two undercover

vehicles, they wore MPD tactical vests with "POLICE" written across the front in three-to-four

inch white lettering, and their badges were displayed.  Id. at 6, 15-16.  At least one of the officers'

windows had been rolled down, the conditions were clear, and it was still daylight.  Id. at 27-29,

30-31.

        Upon arrival, the officers noticed a vacant blue van that closely matched the description

given in the e-mail, but differed slightly from the license plate number provided.  Id. at 5, 17.  The

officers continued into the north alley of the 600 block of Emerson Street, NW, and saw a green

Lexus parked in the backyard of 631 Emerson Street -- the private residence of defendant's

mother.  See id. at 5.  The officers saw defendant emerge from the green Lexus, walk into the

alley, and continue north onto 7th Street past the corner of Farragut Street, repeatedly looking over

his shoulder at the officers' vehicle as they followed behind.  Id. at 5-6.  Officer Ramey exited the

police vehicle and asked if he could speak with defendant.  Id. at 6-7.  When defendant responded

affirmatively, Officer Ramey identified himself as a police officer, briefly outlined the nature of

the complaint that he was investigating, and asked defendant if he had seen anything pertinent.  Id.

at 7.  Defendant answered in the negative.  Id.  Officer Ramey further inquired as to how long

defendant had been in the area and whether he lived there.  Id.  In response, defendant claimed

that he lived in College Park, MD, and had taken the bus to Emerson Street -- a statement that

aroused Officer Ramey's suspicions, as he had just witnessed defendant emerge from the green

Lexus.  See id.  At this time, the officers did not know that defendant was Eddie Dubose.  See Tr.

at 5, 7, 16-17.

Officer Ramey next asked to see defendant's identification, and defendant complied. Id.

at 7. Upon realizing that he was speaking with the individual named in the e-mail complaint,

Officer Ramey inquired whether defendant possessed any dangerous weapons, and defendant

disclosed that he was wearing a knife around his neck "for protection." Id. at 7-8. Officers

Hoetzel, Stewart, and Jones had since exited their police vehicles and joined Officer Ramey,

standing behind defendant. See id. at 9, 23. Officer Ramey asked defendant to produce the knife

-- a five-inch fixed-blade dagger -- and defendant complied. Id. at 7, 8. According to Officer

Ramey, defendant did not appear hostile, nervous, or uncooperative -- he was compliant, friendly,

and had not objected when asked to speak with the officers, produce identification, or turn over

the knife. See id. at 8. Once they had confiscated the knife, the officers informed defendant that

he was under arrest for carrying a dangerous weapon ("CDW"). Id. at 8-9. At this point,

defendant's demeanor changed markedly. As the officers began to handcuff him, they directed

him to turn his back and place his arms and hands behind him. Id. at 9. Defendant began to do

so, but then suddenly attempted to break away, pushing through Officers Hoetzel, Stewart, and

Jones. Id. at 9. The officers eventually subdued him, but not before having to "take him to the

ground" as he "flail[ed] his arms" and attempted to resist custody. Id. at 9. In the midst of the

altercation, he elbowed Officer Stewart in the head. Id.

Once defendant was handcuffed, the officers removed his belt, socks, shoes, and

shoestrings in preparation for transport to the station house. Id. at 9-10. The officers also

performed a thorough search of defendant's person, which yielded a key ring that contained two or

three sets of car keys and $1,562.00 in U.S. currency. Id. Officer Jones took the car keys and

walked to the green Lexus, while Officer Ramey began placing defendant's belongings in an evidence bag.  Id. at 10.  Neither the green Lexus nor Officer Jones were visible to Officer Stewart, Officer Hoetzel, or Officer Ramey from where they were located at this time.  See id. at 10-11, 20-22, 26.  Defendant was left in the charge of Officer Ayllon while Officer Ramey placed the evidence bag in the police vehicle.  Id. at 11.  Defendant then broke free from Officer Ayllon's custody, taking flight a second time.  Id.  Although barefoot and handcuffed, he ran approximately a block and a half -- heading northbound on 7th Street and making a left onto Gallatin Street, away from the green Lexus -- before he was stopped by a car traveling eastbound on Gallatin Street that nearly struck him, allowing Officer Hoetzel and Officer Ramey to subdue him.  Id. at 11-12.

Meanwhile, Officer Jones had pressed the keypad on defendant's key ring, and the green Lexus responded.  Id. at 32-33.  He then attempted to determine the owner of the vehicle by running a check on the license plate number, but the vehicle was unregistered.  Id.  Suddenly, Officer Jones recalled a lookout for a vehicle matching the green Lexus' description.  Id. at 33-34, 44.  Apparently, that vehicle had been involved in another narcotics transaction one month earlier, during which an undercover member of 4D FMT purchased narcotics from another individual (not defendant) in the same area.  Id. at 34, 45, 46.  During that incident, the alleged drug dealer had walked to a green Lexus after making contact with the undercover officer, and subsequently sold the illegal narcotics for profit.  Id. at 34-35, 45.  Officer Jones was part of the arrest team for that operation, and although he did not personally witness the sale, he did see the green Lexus at the scene.  Id. at 35-36, 47, 50-51.  He was not, however, personally aware of the precise license plate number for the vehicle.  See id. at 48.  Officer Jones telephoned another of the officers involved in

the undercover operation, and received confirmation that the license plate number was the same as that of the green Lexus currently parked at 631 Emerson Street, NW.  Id. at 37-38, 48. Thereafter, that officer arrived at 631 Emerson Street, and personally identified the green Lexus as the same vehicle that was the subject of the lookout.  Id. at 48.  The officers then seized the vehicle and towed it to the Fourth District impound lot.  Id. at 38-39, 48-49.  Defendant contends that approximately two hours passed between the time that the vehicle was positively identified and the time that it was towed.  See id. at 49.  While the vehicle was being guarded, awaiting the tow truck, an individual named Carl Wilson attempted to back his van into the yard at 631 Emerson Street, NW.  Id. at 39.  Mr. Wilson identified himself as the son of the woman who resided there, and stated that his "brother Eddie" owned the green Lexus.  Id. at 39.

A canine unit arrived at the Fourth District impound lot, and a drug-detection dog was permitted to conduct an exterior sniff test of defendant's vehicle.  Id. at 39.  The dog reacted positively to the vehicle, indicating that something of interest was located within.  Id. at 39-40. The officers then searched the green Lexus and allowed the dog to conduct an interior sniff test. Id. at 40.  Ultimately, the officers recovered rock cocaine, marijuana, THC residue, a loaded gun, an additional loaded magazine for the gun, and a green attache case that contained a digital scale. Id. at 40-42.  The officers also found a photo album that contained photos of defendant, his girlfriend, and his child, and mail matter that belonged to him.  Id. at 41.  The officers did not have a warrant for defendant's arrest, for the search of his person, for the seizure of the green Lexus, or for any subsequent searches of the Lexus.

2.  *Procedural History*

Defendant filed a motion to suppress the physical evidence obtained from the search of his

person and from the search of the green Lexus, arguing generally that the officers lacked probable

cause to arrest him, to search him or the vehicle, and to seize the vehicle.  See generally Def.'s

Mot. Suppress.  In response, the government claimed that once defendant disclosed that he

possessed a weapon, the officers were justified in frisking him to ensure officer safety under Terry

v. Ohio, 392 U.S. 1 (1968).  See Gov't Response to Def.'s Mot. Suppress at 4. Probable cause for

the arrest, the government argued, was supplied by defendant's possession of a dangerous weapon

in violation of District of Columbia law.  See id. at 5.  As to the Lexus, the government continued,

probable cause to search and seize it existed based upon its positive identification as an

instrumentality of the undercover operation conducted one month earlier, particularly when

viewed in light of the fact that defendant was reputed to be a drug dealer, had recently exited the

green Lexus, and possessed a key to the vehicle.  Id. at 5-6.  As a fallback argument, the

government relied on the doctrine of inevitable discovery, submitting that because the vehicle was

unregistered, it could have been seized, towed, and subsequently subjected to an inventory search

of its contents under the civil forfeiture laws.  Id. at 6.

    A hearing on the motion was held on February 24, 2006, during which defendant made

several legal arguments that, in the Court's opinion, warranted a closer look.  First, defendant

argued that based upon United States v. Christian,187 F.3d 663, 666-68 (D.C. Cir. 1999), and the

plain language of the CDW statute, his arrest for CDW was unlawful because the officers never

determined that he intended to use the knife.  See Tr. at 60-64.  Hence, defendant argued, his

arrest could not have provided a basis for a search of his person incident to a lawful arrest, and

any subsequent searches and seizures were derivatively illegal.  Id.  Probable cause to search the

vehicle, moreover, could not be supplied by its alleged involvement in the previous undercover

operation, defendant claimed, because under <u>United States v. Collins</u>, 439 F.2d 610 (D.C. Cir. 1971), the thirty-day lapse between the two incidents dissipated any probable cause.  <u>Id</u>. at 64-67. Furthermore, defendant contended that because the vehicle was located on private property and no exigent circumstances were present, a warrant was required in order to seize or search it.  <u>See id</u>. at 65-68.

The government indicated a need for additional time in order more closely to assess defendant's arguments and to review the cited case law.  <u>See</u> Tr. at 70, 74-76.  Accordingly, the Court ordered further briefing.  <u>Id</u>.  In its next brief (which actually consisted of two separate submissions), the government maintained that its search of defendant's person was a valid search based upon the doctrine of inevitable discovery because, even if the CDW arrest was unlawful under <u>Christian</u>, defendant still could have been arrested for resisting arrest and assaulting a police officer -- since there is no right to assault a police officer or to resist even an unlawful arrest, defendant could have been lawfully arrested and searched incident to that arrest.  <u>See</u> Gov't Add'l Suppl. Response to Def.'s Mot. Suppress at 1, 5.  With respect to the search and seizure of the green Lexus, the government claimed that the vehicle was seized based upon probable cause provided by its involvement in the earlier undercover operation, <u>id</u>. at 1, 4-5, and also pursuant to civil forfeiture laws because of that involvement, <u>see</u> Gov't Suppl. Response to Def.'s Mot. Suppress at 1, 5-6.  The government further contended that the subsequent search of the vehicle was valid because the drug-detection dog's reaction supplied valid probable cause.  <u>Id</u>.  Moreover, the government continued, the vehicle could have been subjected to an inventory search once civilly forfeited; hence, the physical evidence seized from the vehicle should be admitted pursuant to the doctrine of inevitable discovery.  <u>Id</u>.  As a final fallback argument, the government again

relied on the doctrine of inevitable discovery, reiterating its earlier argument that because the vehicle was unregistered, it could be towed.  Id. at 6.  Accordingly, the officers could have performed a subsequent inventory search that would have produced the seized evidence.  Id.

Defendant responded by arguing that the resistance of arrest and alleged assault of Officer Stewart did not constitute intervening acts that could purge the taint of the illegal arrest for CDW because they did not occur between the illegal arrest and the subsequent unlawful searches.  See Def.'s Reply to Gov't Suppl. Response to Def.'s Mot Suppress at 2-3 ("Def.'s Reply").  This argument, however, appears to have been based on a misapprehension of the facts, as the transcript of the officers' testimony at the suppression hearing establishes otherwise.  See Tr. at 8-9, 10.  Regarding the search and seizure of the green Lexus, defendant reiterated his contention that, based on Collins, the previous undercover operation was not recent enough to supply probable cause to believe that the vehicle contained contraband at the time of defendant's arrest. See Def.'s Reply at 5-9.  According to defendant, moreover, the officers testified at the suppression hearing that the car was seized and searched to recover evidence -- they never contended that it was impounded pursuant to the civil forfeiture laws, and the facts of the previous undercover operation did not provide probable cause to believe that the car had been "used to transport or facilitate the transportation of narcotics" under that statute.  Id. at 10.  Defendant maintained that because the vehicle was seized from private property, a warrant was required under Coolidge v. New Hampshire, 403 U.S. 443 (1971), overruled in part by Horton v. California, 496 U.S. 128 (1990), and the exigent circumstances rationale of Chambers v. Maroney, 399 U.S. 42 (1970), does not apply.  See id. at 11-13.  Finally, defendant refuted the government's administrative forfeiture argument by pointing to the plain language of the

provision, D.C. CODE ANN. § 50-1501.04, which only allows an unregistered vehicle to be towed if it is being operated on a "public highway of the District." Id. at 13-14.

The Court held a Status Conference on March 29, 2006, hoping to gain clarity from counsel and to streamline the issues. When pressed for a response to the defendant's most recent substantive arguments, counsel for the government disclosed that she had been out of the office for several days and was not prepared to discuss the issues in depth. Moreover, she conceded that her previous arguments were based on the mistaken impression that the green Lexus was parked on the public street behind 631 Emerson Street, NW, rather than in the backyard of the private residence. Based upon these statements, the Court asked counsel to submit a new filing outlining the government's position in light of the correct facts of the case.

The government submitted a document on March 31, 2006, conceding that the vehicle's location on private property barred the earlier argument that it could be towed for lack of registration. See Gov't Response to Def.'s Reply Regarding Suppression at 1. Counsel advanced a new argument, however, that the vehicle could be seized and searched without a warrant pursuant to the plain view doctrine because the officers were lawfully on the public street when they saw the green Lexus, and the vehicle allegedly had an immediately apparent nexus to crime based upon Officer Jones' realization that it was involved in the previous undercover operation. Id. at 1-2. In the alternative, counsel maintained that by resisting arrest and assaulting Officer Stewart, defendant created an intervening, independent basis upon which he could have been arrested, and, accordingly, under the doctrine of inevitable discovery, the evidence gleaned from the search of his person is admissible as incident to a lawful arrest. Id. at 2. Furthermore, counsel submitted that the vehicle could also have been searched on this theory, because defendant was

seen alighting from it immediately preceding the events giving rise to his arrest. Id. Finally, counsel argued that even if the search of the vehicle was unlawful, defendant had not made the threshold showing of a reasonable expectation of privacy in the property at 631 Emerson Street, NW. Essentially, this final argument asserts that defendant cannot challenge the allegedly unlawful search and seizure of the green Lexus because the rights of his mother -- not him -- were allegedly violated. Id. at 1. The Court will address defendant's arguments, and the government's response as articulated in counsel's most recent filing, in turn.[2]

## ANALYSIS

I.    *The Warrantless Search of Defendant's Person Did Not Violate the Fourth Amendment*

It is axiomatic that the Fourth Amendment protects citizens from unreasonable searches and seizures. See U.S. Const. amend. IV; Hill v. California, 401 U.S. 797, 804 (1971); Carroll v. United States, 267 U.S. 132, 155-56 (1925). The exclusionary rule, which establishes the default requirement that all searches and seizures be justified by probable cause and conducted pursuant to a judicial warrant, is the prime manifestation of the Constitution's fidelity to this principle. See, e.g., Mapp v. Ohio, 367 U.S. 643, 655 (1961); Weeks v. United States, 232 U.S. 383, 398 (1914). However, the evolution of Fourth Amendment jurisprudence has developed a number of exceptions to the warrant requirement, including the rule that officers may search an individual and the area within his immediate control in connection with his lawful arrest. See, e.g., Chimel v. California, 395 U.S. 752, 763 (1969); see also Michigan v. DeFillippo, 443 U.S. 31, 35 (1979);

_____

[2]The Court understands the government to have abandoned all arguments made in its previous filings -- including the argument that the Lexus could have been towed based upon its lack of registration -- except those that were reiterated or advanced in its most recent (final) filing. Hence, the merits of those arguments will not be addressed in the Court's analysis unless they have been deemed particularly noteworthy.

United States v. Robinson, 414 U.S. 218, 255 (1973). Defendant contends that his arrest for CDW was not lawful, because without intent to use the knife, the elements of the statutory infraction were not satisfied -- that is, his conduct in carrying the knife did not constitute a criminal offense. See Christian, 187 F.3d at 666-68. On this rationale, then, defendant argues that the subsequent search of his person cannot be justified as incident to a lawful arrest.

The Court agrees that the elements of CDW were certainly not satisfied in light of Christian, and defendant's arrest was therefore unjustified. But there is a wrinkle in search and seizure law that, under the circumstances of this case, functions to purge the taint of the officers' conduct: the doctrine of inevitable discovery. Evidence that is seized pursuant to otherwise unconstitutional conduct is excepted from the rigors of the exclusionary rule, provided that the government can convince a court that the officers would more likely than not have obtained the evidence lawfully anyway. Nix v. Williams, 467 U.S. 431, 444 (1984). In essence, then, the doctrine of inevitable discovery operates as the constitutional analog to civil procedure's "harmless error" standard of review. See Nix, 467 U.S. at 444 n.4. Here, by resisting arrest and assaulting Officer Stewart, defendant broke the law. It matters not that he was resisting an unlawful arrest -- in the District, the prohibition on resisting arrest is absolute, and it encompasses even unlawful arrests. See Speed v. United States, 562 A.2d 124 (D.C. 1989); McDonald v. United States, 496 A.2d 274 (D.C. 1985). Hence, there was probable cause to support defendant's lawful arrest for these independent, intervening infractions, see United States v. Watson, 423 U.S. 411, 418 (1976), after which the officers could have searched him, see Chimel, 395 U.S. at 763 (stating that a search incident to arrest encompasses the area within the arrestee's immediate control at the time of arrest). The physical evidence seized from his person, then, would have

been recovered in a search incident to the later lawful arrest notwithstanding the officers' earlier improper arrest of defendant. Accordingly, the exclusionary rule does not mandate its suppression.

II.  *The Warrantless Seizure and Search of the Lexus Violated the Fourth Amendment*

Fourth Amendment rights are personal to the individual -- that is, they may not (with a few very narrow exceptions that are not relevant here) be asserted vicariously. See Steagald v. United States, 451 U.S. 204, 219 (1981); see also Katz v. United States, 389 U.S. 347, 351 (1967) (declaring that "the Fourth Amendment protects people, not places"). A person seeking to challenge a search or seizure as unlawful must establish that he had a legitimate expectation of privacy in the subject of the search or seizure.[3]  See, e.g., Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). A "legitimate expectation of privacy" exists if the interest asserted is "one that society is prepared to recognize as 'reasonable.'" Katz, 389 U.S. at 361.

Here, the Court is not persuaded by the government's argument that defendant lacks a reasonable expectation of privacy in the green Lexus. Although defendant has never directly admitted ownership of the vehicle, the law is not so limiting: in appropriate circumstances, even non-proprietors and occasional users may be found to have an interest that qualifies as a reasonable expectation of privacy. See Minnesota v. Olson, 495 U.S. 91, 97 n.5 (1990); Jones v. United States, 362 U.S. 257, 261 (1960); Katz, 389 U.S. at 353; see also Rakas v. Illinois, 439 U.S. 128, 142 & n.12, 143 (1978). Here, the evidence supports such a finding with respect to

---

[3]This principle is all-too-often collapsed into and confused with the "standing" requirements of Article III. Despite the analytically subtle distinction between the two concepts, they remain distinct. See Minnesota v. Carter, 525 U.S. 83, 88 (1998); Rawlings, 448 U.S. at 104-06; United States v. Lawson, 410 F.3d 735, 740 n.4 (D.C. Cir. 2005).

defendant.  To begin with, defendant was seen exiting the vehicle, and no other individuals were observed in or around the area.  Defendant also possessed a key to the vehicle at the time of his arrest.  Moreover, when the vehicle was searched, the officers recovered personal items that clearly belong to defendant, including photographs of him, his girlfriend and his child, and even mail matter with his name and address.  By parking the vehicle on private property, rather than the public street, defendant implicitly manifested a subjective desire to prevent general access to or visibility of the vehicle and its contents.  Finally, defendant's brother stated that the vehicle in fact belongs to defendant.  Collectively, the facts are sufficient to establish for purposes of defendant's motion that he had a legitimate expectation of privacy in the Lexus.

The law also requires, however, that defendant demonstrate a legitimate expectation of privacy with respect to the property upon which the vehicle was parked when it was seized.  See, e.g., Stewart v. Evans, 351 F.3d 1239, 1243 (D.C. Cir. 2003) (citing United States v. Salvucci, 448 U.S. 83, 93 (1980)).  The record is much less robust on this point, originally consisting only of the facts that: (1) defendant parked the vehicle in the backyard, manifesting a subjective intent to protect the vehicle from public intrusion; (2) defendant's mother resided at 631 Emerson Street; (3) defendant's brother claimed that the green Lexus parked in the backyard belonged to defendant; and (4) defendant's brother likewise parked his own vehicle on the property in a similar fashion, suggesting that it was common practice for the resident's children to do so.  Through an affidavit, defendant has since confirmed that his mother lives at 631 Emerson Street (and has for his entire life), and that he regularly visits her there and leaves personal items there (including in

her backyard), believing that they will not be disturbed.[4]  The Court concludes that defendant has established a legitimate expectation of privacy in the property based on this record.

The "legitimate expectation of privacy" analysis has always been shaped by social norms and widespread practices.  See Olson, 495 U.S. at 98; Katz, 389 U.S. at 391.  In the Court's view, family visits are a "longstanding social custom that serves functions recognized as valuable by society."  Olson, 495 U.S. at 98; see Morton v. United States, 734 A.2d 178, 182 (D.C. 1999) (holding that a short-term social guest who did not spend the night, but maintained a ten-year friendship with the resident, visited with "the regularity of a family member," and was considered by the resident to be "like family" had achieved "'a degree of acceptance into the household'" that bestowed upon him a legitimate expectation of privacy) (citing Carter, 525 U.S. at 89 (Scalia and Thomas, JJ., concurring)).[5]  Parking on the property of one's host is a common social practice.

_____

[4]The Court offered the government an opportunity to cross-examine defendant regarding his affidavit, but the government declined.

[5]Because the Supreme Court's fractured opinion in Carter would have been impossible without Justice Kennedy's concurring opinion, it must be read in light of that concurrence.  See United States v. Higgins, 282 F.3d 1261, 1271 (10th Cir. 2002); Morton, 734 A.2d at 180-81.  Justice Kennedy joined the majority based upon his expressed understanding that its rationale was "consistent with [his] view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home."  Carter, 525 U.S. at 99 (Kennedy, J., concurring).  From his perspective, the mandate of Rakas was simply that a person contesting a search or seizure taking place on the property of another must establish a personal privacy right based upon a "meaningful connection to [the host's property]."  Id. at 101.  If, as Justice Kennedy stated, "as a general rule, social guests will have an expectation of privacy in their host's home," id. at 102, then it would be irrational to hold that a son does not have such an expectation in his mother's property when he parks there.  The mother-son relationship far exceeds the bounds of what is ordinarily required to establish a legitimate expectation of privacy.  See Bonner v. Anderson, 81 F.3d 472, 475 (4th Cir. 1996) (finding a legitimate expectation of privacy because defendant was a frequent visitor and frequently ran errands for the owner of the home); State v. Trecoci, 630 N.W.2d 555, 569-70 (Wis. 2001) (finding a legitimate expectation of privacy in another's attic because defendant was the fiancee of the owner and had used it for socializing on prior occasions); In re Welfare of B.R.K., 658 N.W.2d 565, 576 (Minn. 2003) (finding a legitimate expectation of privacy because juvenile defendant was on the premises as a short-term social guest with the consent of a resident and was a social acquaintance of the resident).  It matters not that the property at issue is the backyard, rather than the residential structure -- the protections of the Fourth Amendment do not dissolve

When a son drives his vehicle to visit his mother's home, the natural course of action is to park that vehicle on the property -- either in the driveway or the backyard -- in order to keep the vehicle safe from unwanted intrusion and general access on the public street.[6]  In the Court's view, the circumstances of this case -- involving a common social practice and a close familial nexus to the property, as well as the subjective belief of defendant that his personal property was secure when left on his mother's property -- support a finding that defendant had a legitimate expectation of privacy in his mother's backyard during the time that the vehicle was parked there.[7]

Having concluded that defendant may contest the search and seizure of the vehicle, the Court now considers the government's contention that the vehicle could have been searched and seized without a warrant (despite its location on private property) based upon the "plain view" doctrine.  This doctrine provides that a warrantless search or seizure does not violate the Fourth Amendment if:  (1) the officers are lawfully on the premises when they notice the subject of the

---

at the front door of the home, but rather extend to the property that "immediately surround[s] and [is] associated with" the home.  See Hester v. United States, 265 U.S. 57, 57 (1924).

[6]The Court is not persuaded by the government's argument that the record does not establish that defendant was visiting his mother on this specific occasion.  He regularly does so, and regularly parks his vehicle in the backyard believing and intending that it will be undisturbed and protected from intrusion. He was seen parking the vehicle there on this occasion.  With reasonable inferences, that is enough for a legitimate expectation of privacy to arise.

[7]The case cited by the government, United States v. Mendoza, 438 F.2d 792 (7th Cir. 2006), does not convince the Court otherwise.  To begin with, that case is not controlling authority, and, in this Court's view, its rationale is questionable.  More significantly, however, Mendoza involved a substantially distinguishable factual record.  The defendant in Mendoza was an admitted drug dealer who consented to the search of a home belonging to another individual -- in which he was staying on a temporary basis -- and subsequently attempted to challenge the seizure of his vehicle, which was parked in a garage on the property.  The court found that he never established the requisite nexus between himself and the stand-alone, separate structure in which the vehicle was located.   Although he claimed to be an overnight guest in the residence, there was no evidence to support a finding that he was meaningfully connected to the garage shed located elsewhere on the property.  Moreover, the Mendoza defendant was not related to the owner of the property, and there was no evidence that his connection to either the property or the owner was social (rather than strictly commercial) in nature.

search or seizure, which is (2) already exposed to view, see Arizona v. Hicks, 480 U.S. 321, 324-25 (1987), and (3) has a readily identifiable nexus to crime.  See Coolidge, 403 U.S. at 465, 466; Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citing Horton, 496 U.S. at 136-37; Texas v. Brown, 460 U.S. 730, 739 (1983)).   The government submits that based upon the vehicle's alleged involvement in the undercover operation conducted one month prior, the green Lexus constituted an instrumentality of crime for which no warrant was required because the officers noticed it when they were located on the public street.  The Court agrees that the first two elements of the plain view inquiry are satisfied -- the officers had a right to be on the public street, where they were responding to the e-mail complaint, and the vehicle was in plain sight.  The third requirement, however, is not met.  The facts of the case, and the conduct of Officer Jones, belie the government's assertion that the vehicle had a readily identifiable nexus to crime.

To begin with, any nexus to crime is weak at best, as the officers never determined that any narcotics or drug paraphernalia were located inside the vehicle during the prior undercover operation.[8]  The testimony of Officer Jones establishes that no officer was able to see inside the green Lexus because the windows were tinted.  Although the alleged drug dealer went to the vehicle and sat in the passenger seat briefly before returning and exchanging narcotics for money, nobody saw what actually happened in the vehicle -- there is thus no evidence that the narcotics came from the vehicle.  But more significantly, any nexus to crime was simply not readily

---

[8]Although it appears that counsel for the government has wisely abandoned her earlier argument that a search of the vehicle would have been justified based on probable cause provided by the thirty-day old lookout issued in connection with the earlier undercover operation, the Court nevertheless notes that such an argument may not be persuasive in light of Collins.  Despite a more compelling set of facts, Collins held that a much shorter lapse -- six days -- functioned to dissipate any allegedly pre-existing probable cause that would justify a vehicle search for fruits and instrumentalities of the illegal activity. See 439 F.2d at 615-17.

identifiable to Officer Jones. His first instinct was to determine the vehicle's owner, not whether it was the subject of the lookout. He had no personal recollection of the vehicle's license plate, and had to contact the undercover officer involved in that prior operation in order to determine whether it was in fact the same vehicle. The undercover officer then came to the scene and provided further confirmation. The plain view doctrine is narrow, and it does not apply if an officer requires corroboration of his hunch before identifying the object's criminal nexus. <u>See</u> <u>Dickerson</u>, 508 U.S. at 375; <u>Horton</u>, 496 U.S. at 136; <u>see also</u> <u>Hicks</u>, 480 U.S. at 324-25. Rather, the light bulb must illuminate instantaneously -- it may not escalate from a subtle glow to a more robust beacon through further investigation. Without knowledge of the license plate number (or other identifying characteristics), the green Lexus was indistinguishable from all other vehicles of similar make and model. There was no probable cause to believe that the vehicle was contraband until the undercover officer supplied the missing piece of the puzzle. Hence, Officer Jones acted upon a suspicion that the vehicle <u>could have been</u> connected to criminal activity, not on knowledge that it <u>was</u> connected to criminal activity. Accordingly, the plain view doctrine does not apply in these circumstances to excuse the officers from the relatively simple task of acquiring a warrant for a vehicle whose former occupant had already been arrested.

Finally, the government's inevitable discovery argument is likewise unpersuasive. Essentially, the proffered rationale is that because defendant was reputed to be engaged in the sale of narcotics in the area, possessed a key to the green Lexus, was seen exiting the vehicle when the officers arrived, and "the grounds for his arrest emanated shortly thereafter," the car could have been searched incident to defendant's lawful arrest for resisting the CDW arrest and assaulting

Officer Stewart.[9]  But a search incident to arrest could have encompassed only the defendant's person and the surrounding area within his immediate control, defined as the "area from which [defendant] might gain possession of a weapon or destructible evidence." Chimel, 395 U.S. at 763.  The vehicle simply does not fit this description.  To be sure, the government is correct that when a vehicle's "recent occupant" is arrested, the officers may search the vehicle incident to that arrest even though it is not within the arrestee's immediate control in fact.  See Thornton v. United States, 541 U.S. 615, 622-23 (2004) (upholding the validity of a vehicle search as incident to the arrest of its recent occupant even though he had already exited the vehicle and was handcuffed, standing next to the trunk).  The lesson of Thornton is, in essence, that as long as it is possible in theory for the arrestee to access the vehicle, it may reasonably be considered within his immediate control and searched incident to his lawful arrest.  See id. at 620-21.  The need to maintain a "bright line rule" in this context renders irrelevant an assessment of whether the arrestee is likely to access the vehicle.  See id.

The government's reliance on Thornton, however, is misplaced.  Thornton never laid down an absolute rule declaring that any recent contact with a vehicle brings that vehicle within an arrestee's immediate control per se; it did not hold that a vehicle search is justified as incident to arrest simply because the arrestee is a "recent occupant."  Searches conducted incident to arrest are excepted from the warrant requirement based upon the exigent circumstances presented by the inherently volatile nature of every arrest -- specifically, a concern for officer safety.  See id.  The

---

[9]The defendant was not actually arrested for assaulting Officer Stewart or for resisting arrest.  As discussed supra in Part I, the government's argument is that because defendant could lawfully have been arrested for those infractions, the search could have been justified as incident to that lawful arrest; hence, the officers would have recovered the physical evidence notwithstanding the fact that the CDW arrest was unlawful.

fact that the Lexus was inaccessible to defendant in both theory and fact negates any assertion that the vehicle was searched in the interest of officer safety.  The vehicle was located at least a block from where defendant was arrested -- indeed, it was out of the officers' line of vision -- and was parked in a private backyard, not on a street.  Officer Jones had confiscated the only key from defendant, and defendant had already been handcuffed.[10]  It would stretch even the outermost boundaries of ordinary reason and logic for this Court to hold that, under such circumstances, the Lexus was within defendant's immediate control.  Where, as here, the vehicle is not even theoretically within the immediate control of the arrestee, a search may not be justified under Thornton as incident to arrest[11] (assuming defendant had been arrested for assaulting Officer Stewart and resisting the CDW arrest), and the doctrine of inevitable discovery therefore does not apply.

The issue before this Court is not whether the police could have, consistent with the

_____

[10]It is also worth noting that the search was temporally dislocated from defendant's arrest.  By the time the tow truck had arrived, counsel for defendant estimates that a couple of hours elapsed, and Officer Jones testified that the sun had set.  See United States v. Chadwick, 433 U.S. 1, 15 (1977), overruled on other grounds by California v. Acevedo, 500 U.S. 565 (1991); United States v. $639,558 in U.S. Currency, 955 F.2d 712, 715-18 (D.C. Cir. 1992) (holding that a search of the suspect's luggage did not qualify as incident to his arrest in part because thirty minutes had elapsed).  Searches must generally occur contemporaneously with the arrest in order to be deemed reasonably incident to that arrest.  See, e.g., Chadwick, 433 U.S. at 15.  Moreover, the officers had already taken exclusive control of the vehicle before it was towed and subsequently searched.  There is nothing in the record to suggest that it would have been impracticable to obtain a warrant -- indeed, the fact that Officer Jones guarded the vehicle until the tow truck arrived suggests that there was ample time to initiate the warrant process, and that no special burden was presented by stationing officers to ensure that the vehicle was not relocated or tampered with in the interim.  Under such circumstances, a search is not considered incident to the arrest some hours earlier.  See id.

[11] As the Court has already noted, the touchstone of search and seizure law is reasonableness.  See U.S. Const. amend. IV; Hill, 401 U.S. at 804; Carroll, 267 U.S. at 155-56.  There can be no argument that it was reasonable for the officers to believe that, in light of defendant's attempted flight, the vehicle was theoretically within his immediate control.  That argument is foreclosed by the circumstances here -- specifically, the fact that both times defendant fled, he ran even further from the vehicle, and in the opposite direction.

Fourth Amendment, seized and searched the green Lexus.  Indeed, it may be that the officers had probable cause sufficient to convince a neutral judicial official to issue a warrant (an issue not before this Court).  But they did not follow that available course.  Under the totality of the circumstances, there was no exigency or other justification for seizing from private property and subsequently searching the vehicle without a warrant.  Hence, the evidence was recovered in violation of the Fourth Amendment and must be suppressed.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's motion to suppress in part and deny it in part.  The physical evidence seized from the search of defendant's person is admissible under the doctrine of inevitable discovery, but the evidence recovered as a result of the search of the green Lexus is inadmissible and will, accordingly, be suppressed.  A separate order has been posted on this date.

  /s/     John D. Bates  
JOHN D. BATES  
United States District Judge  

Dated:   April 19, 2006  

*Copies to*:

Wanda J. Dixon  
U.S. ATTORNEY'S OFFICE  
555 Fourth Street, NW  
Room 4235  
Washington, DC 20530  
(202) 514-6997  
Fax: (202) 514-9155  
Email: wanda.dixon@usdoj.gov  
    *Counsel for the United States of America*

David Walker Bos
FEDERAL PUBLIC DEFENDER FOR D.C.
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
(202) 208-7500
Fax: (202) 208-7515
Email: david_bos@fd.org
    *Counsel for defendant*